SHELDON P. BARR, P.C., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barr v. Commissioner
Docket No. 2962-88
United States Tax Court
T.C. Memo 1992-552; 1992 Tax Ct. Memo LEXIS 575; 64 T.C.M. (CCH) 774; September 17, 1992, Filed *575 Decision will be entered under Rule 155. For Petitioner: Sheldon P. Barr, recognized specially. For Respondent: Robert W. Sadowski and Steven R. Winningham. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiency in and addition to petitioner's Federal income tax for petitioner's taxable year ending February 29, 1984: Deficiency
Sec. 6661(a)
$ 160,124.00
$ 40,031.00
All section references are to the Internal Revenue Code as amended unless otherwise stated. By amended answer, respondent asserts the following additional tax deficiency and additions to tax: Additional
Additions to Tax
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661(a)
50% of interest on
$ 5,696.00
$ 8,291.00
$ 165,820.00
$ 1,424.00
The parties agree that respondent bears the burden of proof with respect to the above additional deficiency and additions to tax. Rule 142(a), Tax Court Rules of Practice and Procedure.
The issues for decision are: (1) Whether respondent is foreclosed by application of the doctrine of collateral estoppel from contending that petitioner is a member of a controlled group of corporations *576 within the meaning of section 1563(a) or that petitioner is a component member of a controlled group within the meaning of section 1563(b); (2) whether petitioner is required to compute its tax for fiscal year ending February 29, 1984, without taking into account the taxable income bracket amounts referred to in section 1561(a)(1); (3) whether petitioner is entitled to deduct, under section 162, the compensation which it paid during fiscal year ending February 24, 1984, to its sole employee, Mr.Sheldon P. Barr, in the aggregate amount of $ 329,604, consisting of wages in the amount of $ 200,000 and contributions to two pension plans in the amount of $ 129,604; (4) whether petitioner is entitled to deduct, under section 404, the above pension plan contributions in the amount of $ 129,604; (5) whether petitioner is entitled to deduct the other expenses claimed on its return for fiscal year ending February 29, 1984; (6) whether petitioner is entitled to deduct a net operating loss carryforward from fiscal year ending February 28, 1982; (7) whether petitioner is entitled to a jobs credit carryforward from fiscal year ending February 28, 1979; (8) whether petitioner earned, and failed *577 to report, interest income from an account at Manufacturers Hanover Trust; (9) whether petitioner is liable for additions to tax for negligence under section 6653(a)(1) and (2); and (10) whether petitioner is liable for an addition to tax under section 6661 for substantially understating its income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts filed by the parties and the attached exhibits are incorporated herein by this reference. Petitioner is a personal service corporation which was incorporated on March 21, 1978, by Sheldon P. Barr, Esquire, under the laws of the State of New York. Petitioner's certificate of incorporation states that it was formed "to practice the profession of Law". At that time, Mr. Barr had been an attorney since 1959 and had specialized in the practice of tax law. During the time period in issue, Mr. Barr owned all of petitioner's issued and outstanding stock. He was petitioner's only officer and director and its sole employee. Petitioner chose to report income and expenses under the cash receipts and disbursements method of accounting and it chose a fiscal year ending February 28. At the time *578 it filed its petition in this case, petitioner's address was P.O. Box 0284, Baldwin, New York. During the fiscal year in issue, Mr. Barr practiced law, in his individual capacity, with Frank Bello, Esquire. For part of the year, they practiced in partnership under the name Barr & Bello. Some time prior to November 15, 1983, they incorporated the firm as a professional corporation and it became known as Barr & Bello, P.C. Throughout the whole year, the firm's offices were located at 370 Seventh Avenue, Suite 1800, New York, New York. During the fiscal year in issue, Mr. Barr's principal activity was supervising the integrated operations of three corporations, Enersonics, Inc., Saxon Energy Corporation, and ALH Energy Management Corporation. These corporations were engaged in an abusive tax shelter scheme involving so-called "energy brains". In substance, the pitch made by Mr. Barr and the other promoters of the tax shelter was that the energy brain would cut the energy costs of operating a large commercial building by efficiently regulating the heating and air conditioning systems used in the building. They offered investors an opportunity to lease an energy brain for installation *579 in a commercial building, and they promised investors certain tax benefits and a share of the cost savings. Mr. Barr's involvement in the above tax shelter started sometime before 1981 when he was contacted about the plan by Mr. Leonard Freedman. Mr. Barr reviewed an offering circular from another similar program which Mr. Freedman had sent to him, and he told Mr. Freedman that it was a "terrific program". The two men decided to implement the plan during 1981. They agreed that Mr. Freedman would be responsible for marketing the program and that Mr. Barr would be responsible for the record keeping and financial details of the program. They agreed to split the profits from the program on a 50-50 basis. Mr. Barr set about to organize several corporations which would appear to be unrelated entities dealing at arm's length but which, in fact, formed a coordinated scheme to sell the energy tax shelters and, thereby, to obtain money from the public by fraudulent means. On or about April 7, 1981, he incorporated Enersonics, Inc. (hereinafter referred to as "Enersonics") ostensibly for the purpose of manufacturing "energy brains". Actually, Enersonics engaged in no manufacturing. *580 Messrs. Barr and Freedman or Enersonics contracted with a factory in Ludlow, Massachusetts, to manufacture the devices on their behalf. At least 50 percent of the stock of Enersonics was issued to Mr. Freedman who was its president. Mr. Barr was secretary of the corporation. In April of 1981, Mr. Barr also incorporated Organized Energy Corporation. The purpose of that corporation was to purchase energy brains from Enersonics at inflated prices and to market the program to the public. Messrs. Barr and Freedman installed a certified public accountant, Mr. Archibald Braunfeld, as president of Organized Energy Corporation. Mr. Barr wanted the president of this company, the marketing company, to be someone who appeared to be an unrelated and independent third party. Mr. Barr felt that this was desirable for a number of reasons, including the fact that the third person would "take the heat" from investors, if a problem arose. Mr. Barr approved Mr. Braunfeld for that position because Mr. Braunfeld, an elderly CPA, presented a dignified appearance and did not want to be paid too highly. Mr. Barr was already acquainted with Mr. Braunfeld through another tax shelter promotion involving *581 the sale of movies through a corporation called Pan Universal. On or about November 4, 1981, Mr. Barr incorporated ALH Energy Management Corporation (herein referred to as "ALH"). The purpose of ALH was to provide investors with a means to place the energy brains in service, as required to obtain the tax benefits under the program. ALH offered investors a package of services in connection with the energy brain tax shelter, including placement and installation of the device in a building, maintenance, insurance, and accounting for profits. Initially, Mr. Barr hired Mr. Alexander Leeman Haupt to act as president of the corporation. Mr. Leeman Haupt was emotionally unstable and shortly thereafter had a nervous breakdown. To take his place, and to maintain the appearance that ALH was an independent corporation, Mr. Barr installed a secretary, Ms. Lynn Siscaretti as president of ALH. Ms. Siscaretti was 18 or 19 years of age at the time. After Ms. Siscaretti resigned in February of 1982, Mr. Barr installed Mr. Kamal Fereg as president. Mr. Fereg considered Mr. Barr to be his boss and believed that all of his actions as president of ALH were subject to Mr. Barr's direction and control. *582 While Messrs. Barr and Freedman were organizing the 1981 promotion, two other individuals, Mr. Frank Giafrieda and Mr. Bill Medina, became involved in the tax shelter scheme. The record does not fully describe the form which their involvement took. In any event, Messrs. Barr and Freedman expected Messrs. Giafrieda and Medina to increase the sales of the program through their contacts with accountants and other persons in the financial world. Mr. Giafrieda arranged for the preparation of promotional material for the 1981 program and he arranged to obtain the legal opinion which was included therein. In the beginning of 1982, the arrangement with Messrs. Giafrieda and Medina soured. They had formed their own corporation, OEC Leasing, to market a tax shelter which was virtually identical to Mr. Barr's scheme. Rather than pursue litigation over the matter, Messrs. Barr and Freedman reached an accommodation with Messrs. Giafrieda and Medina under which the latter individuals took over Organized Energy Corporation and completion of the 1981 promotion. In passing, we note that the promotions made by OEC Leasing have been the subject of a number of cases in this Court. Soriano v. Commissioner, 90 T.C. 44 (1988); *583 Spears v. Commissioner, T.C. Memo. 1992-78; Stanley v. Commissioner, T.C. Memo. 1991-20; Rogers v. Commissioner, T.C. Memo. 1990-619; Keenan v. Commissioner, T.C. Memo. 1989-300; Kaba v. Commissioner, T.C. 1989-148; Heasley v. Commissioner, T.C. Memo. 1988-408, revd. 902 F.2d 380 (5th Cir. 1990). Thereafter, Mr. Barr substituted Saxon Energy Corporation (hereinafter referred to as "Saxon") for Organized Energy Corporation in the tax shelter which he promoted. Saxon had been incorporated on September 27, 1981, and Mr. Braunfeld was also its president. Mr. Braunfeld's role as president of Saxon was limited to signing checks on Saxon's bank account, signing letters and other documents, and meeting with individuals on behalf of Saxon. Mr. Barr oversaw the operations of Saxon and made management and hiring decisions. In early 1983, Mr. Barr hired Mr. James Conlin to be Saxon's bookkeeper. From outward appearances, Messrs. Barr and Freedman manufactured energy equipment through Enersonics which sold *584 the equipment to Saxon, an unrelated corporation under the management of Mr. Archibald Braunfeld. Saxon leased the equipment to investors who contracted with ALH, an unrelated corporation under the management of Mr. Kamal Fereg, to install the equipment and provide other services to them. In reality, Mr. Barr masterminded and controlled the integrated operations of Enersonics, Saxon, and ALH. All three corporations initially operated from a conference room at the law offices of Barr & Bello located on the 18th floor of 370 7th Avenue. After a number of months, the operations of the three corporations were moved to another office located on the fourth floor of the same building. In 1985, after the Attorney General of the State of New York began investigating the scheme, the corporations were moved to Fort Lee, New Jersey. Mr. Barr explained the reason for the move to Mr. Fereg by saying that "once you are out of New York they cannot touch you". Despite the fact that all three corporations shared Enersonics' office, Saxon and ALH maintained different mailing addresses. Saxon used the address of Mr. Braunfeld's accounting office. There was a plaque with Saxon's name outside *585 the door of Mr. Braunfeld's office to further the appearance that Saxon was an unrelated corporation. ALH's address was initially a mail box at One Penn Plaza. Beginning some time in 1983, its address was changed to 488 7th Avenue, Room 8F. Beginning in 1985, its address became 2700 Kennedy Boulevard in New Jersey. This was Mr. Fereg's former apartment which Mr. Barr told him to keep as a mailing address because it had "cheap rent". Mr. Barr controlled the financial affairs of all three corporations. Checks from investors were received by Saxon and were used to pay certain expenses, such as commissions to persons who promoted the sale of the shelter and Saxon's payroll. Saxon transferred money to Enersonics on Mr. Barr's instructions. Enersonics did not bill Saxon or account to Saxon for equipment purchases. Saxon's bookkeeper gave Mr. Barr checks drawn by Saxon to cash at least every other week. Mr. Barr controlled the financial affairs of Enersonics. Mr. Freedman signed Enersonics checks in blank and gave them to Mr. Barr. From time to time, Mr. Barr would cause Enersonics to distribute "bonuses" to himself and Mr. Freedman or to corporations which each of them controlled. *586 For example, Enersonics made payments to Astron Venture Corporation, a corporation owned by Mr. Barr, on the dates and in the amounts as follows: Date
Check No.
Amount
4/19/83
1132
$ 300,000
4/29/83
1149
500,000
7/20/83
1237
565,000
Enersonics also made a payment to petitioner in the amount of $ 25,000 by check, number 1090, dated March 18, 1983. By check dated December 29, 1983, Saxon paid $ 17,500 to SSJ, another corporation owned by Mr. Barr. Mr. Barr also controlled the financial affairs of ALH. The president of that corporation, Mr. Fereg, was authorized to sign checks on its behalf, but he signed checks only as instructed by Mr. Barr. Additionally, he cashed checks for Mr. Barr every Friday. The books and records of each of the three corporations, including the stock books and corporate seals, were maintained under Mr. Barr's supervision and control. Mail addressed to all three corporations was delivered to Mr. Barr's supervision and control. Mr. Barr negotiated with financial advisers who agreed to recommend the tax shelter to their clients in return for a commission. When Mr. Fereg was unsuccessful in finding buildings in which to place the devices, *587 Mr. Barr dealt with "Weatherman Control" and others to assist with that function. Mr. Barr prepared appraisals of the energy brain devices for Mr. Fereg's signature as president of ALH and Mr. Barr prepared correspondence for Mr. Fereg's signature. During 1986, Mr. Barr, Mr. Freedman, Mr. Fereg, Saxon, Enersonics, ALH, and others were indicted by the State of New York on various charges growing out of the energy brain tax shelter scheme, including the crimes of engaging in a conspiracy to defraud and grand larceny. Mr. Barr was tried and found guilty of the crimes of scheme to defraud in the first degree and grand larceny in the second degree. He was sentenced to a prison term and ordered to make restitution in the amount of $ 13,200,000. Druing the period in issue, Mr. Barr was involved with, at least, three other corporations. He incorporated SSJ Venture Corporation (hereinafter "SSJ") on or about December 12, 1983. From that date through February 29, 1984, he owned all of the issued and outstanding stock of the corporation and was the only officer and director of SSJ. Mr. Barr incorporated Astron Venture Corporation (hereinafter "Astron") on or about March 23, 1983, under *588 the laws of the State of New York, and on that date the corporation issued a stock certificate to Mr. Barr for 200 shares without par value. Finally, Mr. Barr incorporated Astron Corporation on or about October 11, 1983, under the laws of the State of New York. The record does not describe the business of any of the last three corporations. Petitioner's U.S. Corporation Income Tax Return for fiscal year ending February 29, 1984, on IRS Form 1120 reports gross receipts of $ 348,000 and interest income of $ 95, for total income of $ 348,095. Concerning the source of petitioner's gross receipts, the record discloses that Western Publishing Company, Inc. paid the following amounts to petitioner: Date of
Check
Check No.
Amount
1/14/83
A589771
$   530.79
2/08/83
A592305
363.48
3/18/83
A596906
491.01
4/19/83
A600060
761.67
5/06/83
A602400
388.83
7/22/83
A610282
581.88
8/12/83
A612638
120.90
9/23/83
A618169
1.56
11/01/83
A622434
114.27
12/06/83
3080
78.00
1/13/84
6472
124.41
$ 3,556.80
The record also discloses that by invoices dated December 23, 1983, and January 27, 1984, petitioner billed United Subscription Services for services *589 rendered in the amount of $ 498.14 and for postage in the amount of $ 819. Finally, as mentioned above, the record discloses that Enersonics paid $ 25,000 to petitioner by check dated March 18, 1983. The record does not disclose the source of the remaining gross receipts reported by petitioner. On its return for fiscal year ending February 29, 1984, petitioner claimed the following deductions which exactly offset its total income: Salaries and Wages
$ 200,000
Taxes
3,122
Depreciation
71
Pension plans
129,604
Travel and Entertainment
6,832
Telephone
1,196
Professional Fees
910
Cleaning and Repairs
1,853
Printing
35
Miscellaneous
1,005
Bank Charges
100
Net Operating Loss
Carryforward
3,367
Total
$ 348,095
Petitioner paid the salaries and wages listed above, in the amount of $ 200,000, to Mr. Barr, its only employee. It made the payments to pension plans listed above, in the amount of $ 129,604, as contributions on Mr. Barr's behalf to two pension trusts, described below. Thus, for its fiscal year ending February 29, 1984, petitioner paid compensation to, or on behalf of, Mr. Barr in the aggregate amount of $ 329,604. For the prior fiscal year, ending *590 February 28, 1983, petitioner paid compensation to Mr. Barr in the form of salaries and wages in the amount of $ 110,000 and made contributions to a pension plan on behalf of Mr. Barr in the amount of $ 176,767. The travel and entertainment expense deducted on petitioner's return, in the amount of $ 6,832, consists principally of the following expenditures which were paid in connection with a party held at the time of the bar mitzvah of Mr. Barr's son: Check No.
Payee
Amount
2040
Hunter Studios, Inc.
$    50.00
2041
Mitchell Schrager
80.00
2042
Ken Michaels Orchestras
50.00
2044
Fontainebleau Caterers
1,500.00
2045
Crystal Caterers, Inc.
788.25
2046
Fontainebleau Caterers
2,869.15
2048
Ken Michaels Orchestras
900.00
2049
Hunter Studios
200.00
2050
Ken Michaels Orchestras
67.50
2051
Colonial Flower and Gift Shop
209.14
Total
$ 6,714.04
The cleaning and repairs expense deducted on petitioner's return, in the amount of $ 1,853, includes two checks in the aggregate amount of $ 1,053 drawn to Mr. Paul Iorio for gardening on the grounds of Mr. Barr's residence. Similarly, the telephone expense deducted on petitioner's return, in the amount of $ 1,196, *591 consists of the aggregate expenditures for a telephone at Mr. Barr's residence. Of the amounts claimed as deductions on petitioner's return, respondent concedes that petitioner is entitled to deduct the following expenses: Expense
Amount
NY State Unemployment Insurance
$ 238.00
NY State Corporation Tax
295.00
Internal Revenue Service (tax)
56.00
Bank charges
7.38
Total
$ 596.38
Petitioner maintained a "special account" at Manufacturers Hanover Trust Company. Mr. Barr exercised sole control over petitioner's special account. Monthly bank statements for the special account for the period beginning February 19, 1983, and ending February 28, 1984, show that interest was credited to the account in the following amounts: 3/18/83
$ 301.12
5/19/83
2.35
6/20/83
2.60
7/21/83
2.53
8/18/83
2.30
9/21/83
2.80
10/21/83
2.62
11/22/83
2.46
12/20/83
2.30
1/20/84
2,131.52
2/22/84
3,456.89
2/28/84
15.12
$ 5,924.61
The monthly bank statements also show that on January 6, 1984, $ 800,000 was deducted from the account and on February 6, 1984, $ 806,458.39 was credited to the account. Respondent treated $ 6,458.39 of that amount as interest and, in *592 an Amendment to Answer, respondent asserts that total interest of $ 12,383.00 was paid on the funds in the account during fiscal year ending February 29, 1984 (i.e., $ 5,924 plus $ 6,458.39). During its fiscal year ending February 29, 1984, petitioner maintained two pension plans: (1) The Sheldon P. Barr, P.C. Pension Trust, which was adopted on February 26, 1983; and (2) The Sheldon P. Barr, P.C. Money Purchase Pension Trust, which was adopted 1 year later on February 27, 1984. Mr. Barr was the Trustee and Plan Administrator of both plans. Petitioner submitted to respondent Applications for Determination for each plan, and, in due course, respondent notified petitioner of a favorable determination for each plan, subject to the adoption of proposed amendments. In each case, petitioner adopted the proposed amendments, and filed a Registration Statement of Employee Benefit Plan. During fiscal year ending February 29, 1984, Mr. Barr was the only person on whose behalf petitioner made contributions to the pension plans. Mr. Barr's individual income tax return for 1984 reports aggregate wages of $ 273,500 composed of the following: Name
EI Number
Amount
Barr & Bello P.C.
13-3184171
$  73,500
Sheldon Barr P.C.
11-2485413
200,000
Total
$ 273,500
*593 He attached to his 1984 return a Schedule E, Supplemental Income Schedule, which reports a loss in the aggregate amount of $ 1,182,976.96 composed of the following: Partnerships:
Barr & Bello
13-2989037
$     2,086.00
S Corporations:
Sheldon P. Barr, P.C.
11-2485413
3,786.00
Astron Venture Corp.
11-2640870
1,177,104.96
Total
$ 1,182,976.96
Finally, Mr. Barr attached to his 1984 return a Schedule C, Profit or (Loss) From Business or Profession, from his "Attorney at Law" business which reports a net loss of $ 9,323.48, composed of the following: gross receipts or sales
$  1,358.00 cost of goods sold
-0-  gross income
1,358.00 bank service charges
$   104.59
car and truck expenses
3,240.00
legal and prof. services
3,307.00
travel and entertainment
4,029.89
(10,681.48)
Net loss
$ (9,232.48)
OPINION
The deficiency at issue in this case, $ 160,124, results from the fact that respondent disallowed all of the deductions claimed on petitioner's Federal income tax return for fiscal year ending February 29, 1984, in the aggregate amount of $ 348,095. In computing the tax resulting from that adjustment, respondent did not allow petitioner *594 the benefit of any taxable income bracket below 46 percent (viz, $ 348,095 X 46% = $ 160,124). Respondent also determined that there was a substantial understatement of income tax, pursuant to section 6661(a), and determined an addition to tax in the amount of $ 40,031, i.e., 25 percent of the amount of the underpayment, $ 160,124. Petitioner bears the burden of proving that respondent erred in making those determinations. Rule 142(a), Tax Court Rules of Practice and Procedure (hereinafter, all Rule references are to the Tax Court Rules of Practice and Procedure). During this proceeding, respondent was permitted to amend the Government's answer to allege an additional deficiency in the amount of $ 5,696. The additional deficiency is based upon respondent's allegation that, during petitioner's fiscal year ending February 29, 1984, it constructively received interest income totaling $ 12,383 from a bank account maintained at Manufacturers Hanover Trust Company. The additional deficiency is the tax on petitioner's alleged unreported interest income (i.e., $ 12,383 X 46% = $ 5,696). Respondent's amended answer also alleges additions to tax for negligence under section 6653(a)(1) *595 and (2) and for substantial understatement under section 6661(a). All of the issues raised in respondent's amendment to answer are new matters for which respondent bears the burden of proof. Rule 142(a). At the outset, it is helpful to highlight two of the adjustments made in the notice of deficiency. The first is set forth in the notice as follows: It has been determined: that the taxpayer is a member of a brother-sister controlled group who failed to elect the surtax exemption and therefore a zero allocation is made to the four tax brackets below the 46 percentage bracket in computing the tax. We note that the surtax exemption, mentioned above, formerly provided by section 11(d), and the surtax, formerly imposed on corporations by section 11(c), were eliminated from the Internal Revenue Code for taxable years ending after December 31, 1978, by the Revenue Act of 1978, Pub. L. 95-600, sec. 301(a), 92 Stat. 2763, 2820. At that time, Congress replaced both the normal tax and the surtax which had been imposed on corporations with a new rate structure, consisting of five tax brackets with marginal tax rates ranging from 17 percent to 46 percent. Id.
In addition to changing *596 the corporate rate structure, Congress amended section 1561(a)(1) to limit component members of a controlled group of corporations to the "amounts in each taxable income bracket in the tax table in section 11(b) which do not aggregate more than the maximum amount in such bracket to which a corporation which is not a component member of a controlled group is entitled." Sec. 1561(a)(1), as amended by sec. 301(b)(19)(A)(i) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2823. Prior to the amendment, section 1561(a)(1) had limited the component members of a controlled group of corporations to one surtax exemption under section 11(d). Id. After the amendment, all of the component members of a controlled group of corporations are required to divide the tax bracket amounts equally among them, unless they all consent to an apportionment plan providing for an unequal allocation. Sec. 1561(a)(1). Thus, when the notice of deficiency in this case refers to "surtax exemption", we understand it to mean that respondent applied section 1561(a)(1) in computing petitioner's tax for its fiscal year ending February 29, 1984, and allowed petitioner no portion of the amount in any of *597 the taxable income brackets set forth in the tax table prescribed by section 11(b)(1) (i.e., $ 348,095 x 46% - $ 160,124). Throughout this opinion, we shall refer to this as the "tax bracket amounts issue". This adjustment is predicated upon respondent's determination that petitioner was a component member of a controlled group of corporations, as defined by section 1563(b), as of December 31, 1983. We shall address the merits of respondent's determination below. At this point, we note that section 1561(a)(1) provides, in pertinent part, as follows: (a) GENERAL RULE. -- The component members of a controlled group of corporations on a December 31 shall, for their taxable years which include such December 31, be limited for purposes of this subtitle to-- (1) amounts in each taxable income bracket in the tax table in section 11(b) which do not aggregate more than the maximum amount in such bracket to which a corporation which is not a component member of a controlled group is entitled, * * * * * * The amounts specified in paragraph (1) shall be divided equally among the component members of such group on such December 31 unless all of such component members consent (at such *598 time and in such manner as the Secretary shall by regulations prescribe) to an apportionment plan providing for an unequal allocation of such amounts. The amounts specified in paragraphs (2), (3), and (4) shall be divided equally among the component members of such group on such December 31 unless the Secretary prescribes regulations permitting an unequal allocation of such amounts. * * * Section 1563(a)(2) defines a brother-sister controlled group of corporations as follows: (a) CONTROLLED GROUP OF CORPORATIONS. -- For purposes of this part, the term "controlled group of corporations" means any group of -- * * * (2) BROTHER-SISTER CONTROLLED GROUP. -- Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing -- (A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each corporation, and (B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock *599 of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation. Furthermore, we note that section 1563(b) defines a "component member" of a controlled group of corporations as follows: (b) COMPONENT MEMBER. -- (1) GENERAL RULE. -- For purposes of this part, a corporation is a component member of a controlled group of corporations on a December 31 of any taxable year (and with respect to the taxable year which includes such December 31) if such corporation -- (A) is a member of such controlled group of corporations on the December 31 included in such year and is not treated as an excluded member under paragraph (2), or (B) is not a member of such controlled group of corporations on the December 31 included in such year but is treated as an additional member under paragraph (3). (2) EXCLUDED MEMBERS. -- A corporation which is a member of a controlled group of corporations on December 31 of any taxable year shall be treated as an excluded member of such group for the taxable year including such December 31 if such corporation -- (A) is a member of such group for less *600 than one-half the number of days in such taxable year which precede such December 31, (B) is exempt from taxation under section 501(a) (except a corporation which is subject to tax on its unrelated business taxable income under section 511) for such taxable year, (C) is a foreign corporation subject to tax under section 881 for such taxable year, (D) is an insurance company subject to taxation under section 801 or section 821 (other than an insurance company which is a member of a controlled group described in subsection (a)(4)), or (E) is a franchised corporation, as defined in subsection (f)(4). (3) ADDITIONAL MEMBERS. -- A corporation which -- (A) was a member of a controlled group of corporations at any time during a calendar year, (B) is not a member of such group on December 31 of such calendar year, and
(C) is not described, with respect to such group, in subparagraph (B), (C), (D), or (E) of paragraph (2), shall be treated as an additional member of such group on December 31 for its taxable year including such December 31 if it was a member of such group for one-half (or more) of the number of days in such taxable year which precede such December 31. (4) OVERLAPPING *601 GROUPS. -- If a corporation is a component member of more than one controlled group of corporations with respect to any taxable year, such corporation shall be treated as a component member of only one controlled group. The determination as to the group of which such corporation is a component member shall be made under regulations prescribed by the Secretary which are consistent with the purposes of this part. The second adjustment which we wish to highlight is set forth in the notice of deficiency as follows: It is determined that the pension/profit sharing contributions are not deductible under the provisions of I.R.C. sections 404 * * * Respondent determined that petitioner is not entitled to a current deduction under section 404 for the contributions which it made to two pension trusts during fiscal year ending February 29, 1984, on the ground that neither of the trusts was a qualified trust under section 401 by reason of the fact that both trusts failed to meet the minimum participation standards of section 410. See sec. 401(a)(3). Thus, respondent determined that neither of the trusts was exempt from tax under section 501, a prerequisite for eligibility to deduct contributions *602 under section 404. Sec. 404(a)(1)(A). This second adjustment is predicated upon respondent's determination that petitioner is a member of a controlled group of corporations, as defined by section 1563(a) and is subject to section 414(b). That subsection provides as follows: (b) EMPLOYEES OF CONTROLLED GROUP OF CORPORATIONS.-- For purposes of section 401, 408(k), 410, 411, and 415, all employees of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a), determined without regard to section 1563(a)(4) and (e)(3)(C)) shall be treated as employed by a single employer. With respect to a plan adopted by more than one such corporation, the minimum funding standard of section 412, the tax imposed by section 4971, and the applicable limitations provided by section 404(a) shall be determined as if all such employers were a single employer, and allocated to each employer in accordance with regulations prescribed by the Secretary. Under section 414(b), all employees of all corporations which are "members of a controlled group of corporations (within the meaning of section 1563(a)" are treated as employed by a single employer for *603 purposes of section 410. Fujinon Optical, Inc. v. Commissioner, 76 T.C. 499, 503 (1981). Based upon the determination that petitioner is a member of a controlled group, respondent further determined that the subject pension plans discriminate in favor of shareholders, officers, and highly compensated employees, and they violate the minimum participation standards set forth in section 410. The latter determination is based on the fact that Mr. Barr, petitioner's sole employee, was the only person entitled to participate in each of the two pension plans and other persons employed by other corporations which were members of the same controlled group were not covered by the plans. Throughout this opinion, we shall refer to this as the "pension plan issue". In applying section 414(b), for purposes of the discrimination rules of section 410(b), the regulations provide as follows: (8) Certain Controlled Groups. In applying the percentage test and classification test described in paragraph (b)(1) and (2) of this section for a year, all the employees of corporations or trades and businesses whose employees are treated as employed by a single employer *604 by reason of section 414(b) or (c) must be taken into account. The preceding sentence shall apply for a plan year if, on 1 day in each quarter of such plan year, such corporations are members of a controlled group of corporations (within the meaning of section 414(b)) or such trades or businesses are under common control (within the meaning of section 414(c)). [Sec. 1.410(b)-1(d)(8), Income Tax Regs.] Accordingly, for purposes of applying the discrimination rules of section 410(b), a determination under section 414(b) must be made for each pension plan as to each quarter of the plan year to see which corporations are members of the controlled group of corporations and, thereby, to see which employees are to be taken into account in applying the discrimination rules of section 410(b). In effect, respondent determined in this case that petitioner was a "member of a controlled group of corporations (within the meaning of section 1563(a)" on at least one day in each quarter of the plan year ending February 29, 1984, of each of the two pension plans in issue. See sec. 414(b); sec. 1.410(b)-1(d)(8), Income Tax Regs.
For purposes of the pension plan issue, respondent was not required *605 to determine, as was necessary for purposes of the income tax bracket issue, that petitioner was a component member of a controlled group of corporations. See sec. 414(b). The two definitions are not the same. This is confirmed by section 1.414(b)-1, Income Tax Regs., promulgated in 1988, which states as follows: For purposes of this section * * * [i.e., sec. 1.414], the term "members of a controlled group" means two or more corporations connected through stock ownership described in section 1563(a)(1), (2), or (3), whether or not such corporations are "component members of a controlled group" within the meaning of section 1563(b). Two or more corporations are members of a controlled group at any time such corporations meet the requirements of section 1563(a) (as modified by this paragraph). * * * As stated above, two or more corporations are "members of a controlled group" whenever they meet one of the three stock ownership tests set out in section 1563(a). However, the definition of "component member" of a controlled group in section 1563(b) is different. A corporation is a "component member" of a controlled group for any taxable year (1) if it is a member of the group on *606 the December 31 included in such year, and is not treated as an "excluded member", or (2) if it is not a member on December 31 but is treated as an "additional member". Sec. 1563(b)(1). In this case, petitioner concedes that its sole stockholder, Mr. Barr, also owned all of the issued and outstanding stock of two other corporations, Astron and SSJ. Based on that concession, it is clear that petitioner is a member of a brother-sister controlled group of corporations, within the meaning of section 1563(a)(2), consisting of, at least, three corporations, petitioner, Astron, and SSJ. Of that controlled group, only petitioner and SSJ are component members, within the meaning of section 1563(b), because Astron is an S corporation, and, therefore, is an "excluded member". Sec. 1.1563-1(b)(2)(ii)(c), Income Tax Regs.
Petitioner contends that its pension plan contributions are nevertheless deductible because Astron and SSJ had no employees other than Mr. Barr and, therefore, there are no other employees to take into consideration in applying the nondiscrimination rules of section 410(b). Furthermore, petitioner contends that it is nevertheless entitled to all of the amounts in each *607 taxable income bracket based upon Mr. Barr's testimony at trial as follows: Should the court find a deficiency in petitioner's return and if an allocation would have had to have been made, then the allocation -- then I would elect to have the allocation apply to this corporation, the petitioner's corporation. Respondent contends that, in addition to Astron and SSJ, Mr. Barr also owned or controlled all of the stock of Saxon and ALH so that for purposes of the pension plan issue, during the fiscal year of each of the two pension plans ending February 29, 1984, the members of the controlled group consisted of petitioner, Ashtron, SSJ, Saxon, and ALH. Thus, according to respondent, Saxon's employee, Mr. James Conlin, and ALH's employee, Mr. Kamal Fereg, must be taken into consideration in applying the nondiscrimination rules of section 410(b). Respondent further contends that as of December 31, 1983, the component members of the controlled group were petitioner, SSJ, Saxon, and ALH. According to respondent, petitioner is not entitled to any taxable income bracket amount, and petitioner's attempt to formulate an apportionment plan through Mr. Barr's testimony at trial is untimely *608 and of no effect for purposes of section 1561(a)(1). 1. Whether the doctrine of collateral estoppel applies in this case. Before addressing the above issues, we must confront petitioner's assertion that "this Court conclusively determined that "* * * Petitioner was not a member of a controlled group of corporations * * *" in a prior case, Sheldon P. Barr, P.C. v. Commissioner, T.C. Memo. 1988-471 (hereinafter referred to as "Barr I"), and that the doctrine of collateral estoppel prohibits a different determination in this case. As a threshold matter, respondent argues that the issue of collateral estoppel is not properly before the Court because petitioner failed to affirmatively plead the issue as required by Rule 39. We agree with respondent that collateral estoppel must be affirmatively set forth in the pleadings of the party who desires to raise it. Bonaire Development Co. v. Commissioner, 76 T.C. 789, 802-803 (1981), affd. 679 F.2d 159 (9th Cir. 1982). We reject respondent's argument because we agree with petitioner that the issue was timely raised. Petitioner's representative, *609 Mr. Barr, points out that our opinion in Barr I was issued after the petition in this case was filed and that petitioner raised collateral estoppel shortly thereafter in Petitioner's Motion For Partial Summary Judgment and to Shift The Burden Of Proof. Petitioner also raised the issue in its Pre-trial Memorandum, and throughout the trial of this case. Accordingly, we agree with petitioner that the issue of collateral estoppel was tried by express or implied consent of the parties within the meaning of Rule 41. We will grant petitioner's Motion to Conform Pleadings to Proof (Embodying Amendment) which petitioner filed in response to respondent's argument. The companion doctrines of res judicata and collateral estoppel are judicially created doctrines to ensure the finality of decisions. E.g., Kremer v. Chemical Construction Corp., 456 U.S. 461, 466-467 n.6 (1982). Both doctrines are potentially applicable after a court of competent jurisdiction renders a final judgment on the merits of a cause of action. Res judicata precludes a party to the suit and his privies from relitigating the issues that were or could have been raised in the first action. *610 E.g., Allen v. McCurry, 449 U.S. 90, 94 (1980); Commissioner v. Sunnen, 333 U.S. 591, 597-598 (1948). Collateral estoppel precludes a party to the suit and his privies from relitigating, in a later suit on a different cause of action, the issues of fact and law which were actually and necessarily decided by the court in reaching its judgment in the first action. United States v. Mendoza, 464 U.S. 154, 158 (1984); Commissioner v. Sunnen, supra.
We note that, in this Court, each tax year of the same taxpayer is the origin of a new liability and of a separate cause of action. Commissioner v. Sunnen, supra at 597. Therefore, a final judgment as to one tax year cannot be res judicata as to a different tax year. Commissioner v. Sunnen, supra at 598; Peck v. Commissioner, 90 T.C. 162, 165 (1988), affd. 904 F.2d 525 (9th Cir. 1990). In this case, petitioner seeks to preclude respondent from relitigating an issue which was allegedly *611 decided in Barr I, a case involving a different fiscal year from the tax year in issue in this case. Thus, we are called upon to apply the doctrine of collateral estoppel, rather than res judicata. The party who raises collateral estoppel, like the party who raises any affirmative defense, has the burden of proving its elements. Rules 39 and 142(a). Calcutt v. Commissioner, 91 T.C. 14, 20-21 (1988). Accordingly, in this case, petitioner must prove that the application of collateral estoppel is appropriate under the three-prong tests set forth by the Supreme Court in Montana v. United States, 440 U.S. 147, 155 (1979). Petitioner must prove (1) that the issues presented are, in substance, the same as those resolved in Barr I; (2) that the controlling facts or legal principles have not changed significantly since Barr I; and (3) that there are no other special circumstances which warrant an exception to the normal rules of preclusion. Montana v. United States, supra at 155. Thus, we turn to the issues and the Court's opinion in Barr I. That case involved petitioner's Federal income *612 taxes for fiscal year ending February 28, 1983, the taxable year immediately preceding the year in issue in this case. In a notice of deficiency for that year, the Commissioner determined a deficiency of $ 153,269 in petitioner's tax and an addition to tax under section 6661 in the amount of $ 15,327. In computing the tax deficiency for that year, the Commissioner determined that petitioner was not entitled to any of the deductions claimed on its return in the aggregate amount of $ 333,193 and petitioner was not allowed the benefit of any income tax bracket amount below 46 percent (i.e., $ 333,193 x 46% = $ 153,269). The notice of deficiency at issue in Barr I states as follows: It has been determined that the taxpayer is a member of a brother-sister controlled group who failed to elect the surtax exemption and therefore a zero allocation is made to the four tax brakets [sic] below the 46 percent bracket in computing the tax. By amended answer, the Commissioner asserted that petitioner had failed to report additional income of $ 340,000. In addition, shortly before trial, respondent raised the claim that petitioner's pension plan contributions during the year, totaling $ 176,767, *613 were not deductible because employees of other members of the controlled group were not covered by the plan. The Court described the issues for decision in Barr I as follows: After concessions by respondent, the issues for decision are (1) whether petitioner received unreported income of $ 340,000; (2) whether petitioner's taxes are to be computed as those of a member of a brother-sister controlled group which failed to elect the surtax exemption; and (3) whether petitioner is entitled to a pension/profit-sharing deduction of $ 176,767. Issue 2, as summarized above, is similar to, but not the same as, the tax bracket amounts issue in the instant case. In Barr I, the issue was whether the limitation imposed by section 1561(a)(1) was applicable in computing petitioner's tax for fiscal year ending February 28, 1983. Since the issue had been raised in the notice of deficiency, petitioner bore the burden of proving that petitioner was not a "component member" of a controlled group of corporations on December 31, 1982, and that the limitation was not applicable in computing petitioner's tax. Issue 3, as summarized by the Court in Barr I, is similar to, but not the same as, the pension *614 plan deduction issue in the instant case. In Barr I, the issue was whether petitioner was entitled to deduct $ 176,767, the amount contributed during fiscal year ending February 28, 1983, to the Sheldon P. Barr, P.C. Pension Trust ending February 28, 1983. The predicate underlying the tax brackets amounts issue in Barr I, was respondent's position that petitioner was a "component member" of a controlled group of corporations, as defined by section 1563(b), on December 31, 1982. The predicate underlying the pension plan issue in Barr I, was respondent's position that petitioner was a "member" of a brother-sister controlled group of corporations, as defined by section 1563(a)(2), on one day during each of the quarters of the plan year ending February 28, 1983. As mentioned above, the definitions of the terms "component member" and "member" are not the same. See sec. 1.414(b)-1, Income Tax Regs. Nevertheless, the facts in Barr I required no distinction between the terms, and neither the parties nor the Court drew a distinction between the two. The Court described the Commissioner's contention in Barr I as follows: Respondent contends that petitioner is a member of a brother-sister *615 controlled group as defined in section 1563(a). According to respondent, the other members of the controlled group are Enersonics, Saxon, and ALH. Respondent's contention is summarized as follows: Based on the evidence Sheldon P. Barr owned at least 80% of either ALH or Saxon Energy or both. Respondent concedes that they have been unable to establish who actually owned the stock of either ALH or Saxon. However, the evidence shows that if Barr did not actually own the stock he would have at least had constructive ownership of the stock. Fereg and Braunfeld, the presidents of ALH and Saxon, respectively, were the only other parties who may have rivalled Barr as to ownership of each corporation. The record supports the contention that they did not control either corporation, Barr controlled them and also each corporation. [Sheldon Barr, P.C. v. Commissioner, T.C. Memo. 1988-471.]
It is evident from our opinion in Barr I that the record made by the parties was "sketchy". Our opinion states as follows: Neither party has presented evidence from which we can determine who, if anyone, owns stock in Enersonics, ALH, and Saxon. Neither party has presented *616 us with a comprehensive explanation of the respective roles of the corporations, although each party alludes to a tax shelter scheme involving an overvalued energy brain. Neither party has identified Freedman or his role despite references to Freedman by the witnesses and in the documents. [Id.] Nevertheless, the Court's opinion in Barr I did not turn on the burden of proof. We stated as follows: While the surtax exemption and pension plan deduction issues each turn on whether or not petitioner is a member of a controlled group, our resolution of neither is affected by the allocation of burden of proof in this instance. Our conclusion, based on the preponderance of the evidence, is that petitioner was not a member of a controlled group. [Id.] After reviewing the evidence presented by the parties, we concluded as follows: None of the evidence establishes that Barr owned at least 80 percent in any corporation other than petitioner. The evidence of activities of Braunfeld and Fereg, combined with the evidence that Barr had at least one other "partner," Freedman, tends to negate 80 percent ownership or control in any one person. None of the evidence is sufficient *617 to overcome Barr's categorical testimony [that petitioner was not a member of a controlled group]. * * * We therefore accept Barr's testimony and conclude that petitioner was not a member of a controlled group of corporations within the meaning of section 1563(a). [Id.] We agree with respondent that collateral estoppel is not applicable in this case. Petitioner has failed to show that the issues are in substance the same as those in Barr I, and petitioner has failed to show that there has not been a significant change in the controlling facts or legal principles since Barr I was decided. Petitioner describes the issue which it contends was "conclusively determined" in Barr I in its post-trial brief as follows: In Barr I this court conclusively determined that "* * * Petitioner was not a member of a controlled group of corporations * * * * "there is absolutely no evidence in the instance case to show any change in that relationship and consequently the doctrine of collateral estoppel conclusively determines that Petitioner was not a member of a controlled group and that Petitioner's contributions to the employee benefit plans were proper and deductible. Petitioner's fiscal *618 year ending February 28, 1983, was at issue in Barr I, and the Court's determination was limited to that fiscal year. Thus, in Barr I, the Court determined that petitioner was not a component member of a controlled group of corporations on December 31, 1982, and that petitioner was not a member of a controlled group of corporations on any day during any of the quarters in the plan year ending on February 28, 1983. The issues in this case involve petitioner's status as a component member of a controlled group on December 31 of the following year, 1983, and its status as a member of a controlled group during each of the quarters under the two pension plans which were in place during petitioner's fiscal year ending February 29, 1984. Petitioner has not shown that the issues in this case are the same as the issues in Barr I. See generally, Restatement (Second) of Judgments sec. 27 comment C (1980). Indeed, petitioner concedes that, during the later period at issue in this case, it was a member of a controlled group with Astron and SSJ and that it was a component member of a controlled group with Astron Joint Venture. If we hold that Barr I "conclusively determined" that petitioner *619 was not a member of a controlled group of corporations, as argued in petitioner's opening brief, then, presumably, respondent would be foreclosed from treating petitioner as a member of a controlled group with Astron and SSJ, contrary to the concessions made by petitioner. Petitioner's reply brief, states "that the question of control of Saxon, ALH, and Enersonics was actually litigated and determined against respondent" in Barr I. Thus, in its reply brief, petitioner appears to limit the issue to which collateral estoppel applies to that of Mr. Barr's control of Saxon, ALH, and Enersonics. However, Barr I involved petitioner's prior fiscal year, and the Court's determination in that case, as to Mr. Barr's ownership or control of Saxon and ALH, does not have any necessary bearing on his ownership or control of Saxon or ALH during the year at issue in this case. See Beirne v. Commissioner, 61 T.C. 268 (1973). If we find that Mr. Barr owned or controlled Saxon and ALH, in addition to Astron and SSJ, during fiscal year ending February 29, 1984, that finding would not in any way impugn our opinion in Barr I. For these reasons, we find that petitioner *620 had not shown that the issue in Barr I concerning Mr. Barr's ownership or control of Saxon and ALH is the same as the issue in this case. See Beirne v. Commissioner, supra.
Even if the issues in Barr I were the same, petitioner has also failed to show that the controlling legal principles have not changed significantly since Barr I. In fact, it appears that the controlling legal principles have changed because the burden of proof is allocated differently in these proceedings than it was in Barr I. That difference precludes application of collateral estoppel in this case. See Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689, 693-694 (11th Cir. 1984), vacated on other grounds 779 F.2d 1485 (11th Cir. 1986); Worcester v. Commissioner, 370 F.2d 713, 716-717 (1st Cir. 1966), affg. in part and vacating and remanding in part T.C. Memo. 1965-199. This exception to the general rule of issue preclusion is set forth in the Restatement (Second) of Judgments (1980) by the American Law Institute as follows: Although an issue is actually *621 litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances: * * * (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action * * * [Restatement (Second) of Judgments sec. 28 (1980), emphasis added.] The reporter's comment accompanying the above statement is as follows: f. Differences in the burden of persuasion (Subsection (4)). To apply issue preclusion in the cases described in Subsection (4) would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden been imposed. While there may be many occasions when such a holding would be correct, there are many others in which the allocation and weight of the burden of persuasion (or burden of proof, as it is called in many jurisdictions) are critical in determining *622 who should prevail. Since the process by which the issue was adjudicated cannot be reconstructed on the basis of a new and different burden, preclusive effect is properly denied. * * * [Restatement (Second) of Judgments § 28 comment f (1980).] The instant case is one "in which the allocation and weight of the burden of persuasion" was critical in determining who prevailed in Barr I. As noted above, in Barr I petitioner bore the burden of proving that it was not a component member of a controlled group for purposes of the tax bracket amount issue, and respondent bore the burden of proving that petitioner was a member of a controlled group for purposes of the pension plan issue. It is evident that this allocation of the burden of proof was critical in determining who prevailed on the basis of the "sketchy" record presented to the Court in Barr I. For the later year at issue in this case, the allocation of the burden of proof is different. Petitioner bears the burden of proving that respondent's determination as to both of the issues is wrong. Petitioner argues that "it does not matter who had the burden of proof" in Barr I because the Court found for petitioner based upon *623 the facts presented and did not decide the case on the basis of the burden of proof. Petitioner's argument is answered in the following excerpt from Wright et al., Federal Practice and Procedure, which also explains why preclusion is inappropriate in this case: The rule that a shift in the burden of persuasion defeats preclusion should apply even if the first action went beyond a negative finding that the burden was not carried. In the example offered above, the first court might go beyond a ruling that the plaintiff had failed to show freedom from contributory negligence to a ruling that in fact the plaintiff was guilty of contributory negligence. On its face, this ruling might seem to warrant preclusion by indicating a determination that the defendant would have been found to carry the burden of proving the negligence of the plaintiff. Any such determination, however, would not be necessary to decision of the first action and may be denied preclusive effect on that score. Denial of preclusion, moreover, rests on grounds deeper than the general necessity principle. However difficult it may be to justify in terms of abstract burden theory, the fact remains that direct responsibility *624 for immediate consequences is apt to control resolution of uncertainty. A tribunal that is prepared to state that the plaintiff was negligent when nothing turns on the statement might easily make a different statement if the defendant's claim were before it for actual disposition. * * * [18 Wright et al., Federal Practice and Procedure, sec. 4422, at 213-214 (1981), fn. refs. omitted.] For the above reasons, we hold that petitioner has failed to show that the doctrine of collateral estoppel should be applied in this case. 2. Tax Brackets Amounts Issue
We have previously described this issue and the positions of the parties. In computing petitioner's tax, respondent allowed petitioner the benefit of no amount in any of the taxable income brackets in the tax table set forth in section 11(b)(1). Petitioner bears the burden of disproving respondent's determination that in computing its income tax for fiscal year ending February 29, 1984, petitioner was subject to the limitation set forth in section 1561(a)(1) because it was a component member of a brother-sister controlled group of corporations. Rule 142(a). We begin our analysis by noting that the flush language of section *625 1561(a) states that the bracket amounts: shall be divided equally among the component members of such group on such December 31 unless all of such component members consent (at such time and in such manner as the Secretary shall by regulations prescribe) to an apportionment plan providing for an unequal allocation of such amounts. * * * Contrary to respondent's determination that petitioner is entitled to no bracket amounts, the statute provides, in the segment quoted above, that the amounts shall be divided equally among the component members of the controlled group of corporations. Thus, we disagree with respondent's determination that petitioner is entitled to no part of the bracket amounts. To determine petitioner's share of the amount in each income bracket, it is necessary first to determine which corporations were component members of the same controlled group of corporations on December 31, 1983. Sec. 1561(a)(1). Petitioner's share will equal the amount in each taxable income bracket multiplied by a fraction, the denominator of which is the number of component members of the controlled group on December 31, 1983, and the numerator of which is one. As mentioned above, *626 petitioner concedes that on December 31, 1983, Mr. Barr owned all of the outstanding stock of Astron and SSJ, and that petitioner, Astron, and SSJ were members of the same controlled group. The parties also agree petitioner and SSJ were component members of the controlled group on December 31, 1983, and they agree that Astron Joint Venture was not a component member on December 31, 1983, because it was an excluded member. Petitioner does not agree, however, with respondent's assertion that Saxon and ALH are also members of the controlled group and also component members of the group. Petitioner makes two arguments against respondent's determination that Saxon and ALH were component members of the controlled group on December 31, 1983. First, relying on Mr. Barr's testimony, petitioner contends that Mr. Braunfeld owned 100 percent of the stock of Saxon and Mr. Fereg owned 100 percent of the stock of ALH, and, thus, those corporations could not have been members of the same brother-sister controlled group of corporations with petitioner. Alternatively, relying on the testimony of various witnesses that Mr. Barr and Mr. Freedman were partners, petitioner contends that Mr. Barr did *627 not own or control more than 50 percent of Enersonics, Saxon, or ALH, and those corporations could not have been members of a brother-sister controlled group within the meaning of section 1563(a)(2). See United States v. Vogel Fertilizer Co., 455 U.S. 16, 22-23 (1982). We do not accept either version of the facts suggested by petitioner. First, we do not credit Mr. Barr's testimony. We observed his demeanor while he testified and we found him to be evasive and not a credible witness. Mr. Fereg denied that he owned any stock of ALH, and Mr. Braunfeld denied that he owned any stock of Saxon. We are not required to accept the unpersuasive testimony of an interested party or witness, and we do not accept Mr. Barr's testimony on this point. Fleischer v. Commissioner, 403 F.2d 403, 406 (2d Cir. 1968), affg. T.C. Memo. 1967-85; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Second, petitioner failed to introduce any evidence from which the ownership of Saxon and ALH could be determined. Petitioner also failed to establish that the corporate records of Saxon and *628 ALH were lost, destroyed, or otherwise unavailable to it. In this connection, we note Mr. Braunfeld's testimony that various records were seized by the Attorney General of the State of New York during his investigation of the tax shelter scheme. However, neither Mr. Braunfeld's testimony nor anything else in the record shows that the corporate stock records of Saxon and ALH were seized by the Attorney General's office, or that such records were not returned to petitioner or Mr. Barr. Third, the general testimony on which petitioner relies that Mr. Barr and Mr. Freedman were partners does not exclude the possibility that Mr. Barr retained ownership of the stock of both Saxon and ALH. Additionally, the degree of control which Mr. Barr exercised over both corporations permits us to infer that he owned sufficient stock of each of the corporations for it to be treated as a brother-sister corporation with petitioner under section 1563(a)(2). Cf. Achiro v. Commissioner, 77 T.C. 881 (1981). In any event, the burden is on petitioner to prove that Saxon and ALH were not component members of the same controlled group of corporations with petitioner. We find *629 that petitioner failed to meet that burden of proof. Accordingly, we hold that on December 31, 1983, petitioner, Saxon, ALH, and SSJ were component members of the same controlled group of corporations. There is no evidence that petitioner and each of the other component members of the controlled group, i.e., Saxon, ALH, and SSJ, consented to an unequal apportionment plan in a written statement, as prescribed by the regulations. See sec. 1.1561-3(b)(1), Income Tax Regs. Therefore, petitioner is entitled to a one-fourth share of each of the taxable income bracket amounts referred to in section 1561(a)(1). 3. Whether the compensation paid to or on behalf of Mr. Barr is deductible under section 162. Respondent determined that the compensation paid by petitioner to Mr. Barr during fiscal year ending February 29, 1984, consisting of salary and wages, $ 200,000, and of contributions to pension plans, $ 129,604, is not deductible. With respect to the salary and wages, the notice of deficiency states: You did not establish that the disallowed portions of the claimed deductions qualified as ordinary and necessary business expense, or that expenditures were [sic] made for the *630 purposes designated. With respect to the pension plan contributions, respondent determined that "the pension/profit sharing contributions are not deductible under the provisions of I.R.C. Sections 404 or 162". During the fiscal year in issue, section 404(a) provided as follows: (a) GENERAL RULE. -- If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing or annuity plan,or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but if they satisfy the conditions of either of such sections, they shall be deductible under this section * * * We note that section 404(a) was amended by section 1851(b)(2)(C)(i) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2863, to read as follows: (a) General Rule. -- If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing or annuity plan, or if compensation is paid or accrued on account of any employee under a plan *631 deferring the receipt of such compensation, such contributions or compensation shall not be deductible under this chapter; but if they would otherwise be deductible, they shall be deductible under this section * * * This amendment was effective as if it had been included in section 512 of the Tax Reform Act of 1984. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1881, 100 Stat. 2085, 2914. In general, section 512 of the Tax Reform Act of 1984 applied to "amounts paid or incurred after the date of enactment of this Act [July 18, 1984] in taxable years ending after such date". Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 512(c)(1), 98 Stat. 863. Section 1.404(a)-1(b), Income Tax Regs., provides the following guidelines concerning this issue: Contributions may therefore be deducted under section 404(a) only to the extent that they are ordinary and necessary expenses during the taxable year in carrying on the trade or business or for the production of income and are compensation for personal services actually rendered. In no case is a deduction allowable under section 404(a) for the amount of any contribution for the benefit of an employee in excess of the amount which, *632 together with other deductions allowed for compensation for such employee's services, constitutes a reasonable allowance for compensation for the services actually rendered. What constitutes a reasonable allowance depends upon the facts in the particular case. Among the elements to be considered in determining this are the personal services actually rendered in prior years as well as the current year and all compensation and contributions paid to or for such employee in prior years as well as in the current year. * * * [Emphasis added.] Thus, it is clear that an employer's contributions to pension or profit sharing plans, such as the ones involved in this case, are not deductible under section 404 unless they are deductible under section 162 as ordinary and necessary expenses. See Edwin's, Inc. v. United States, 501 F.2d 675, 679 (7th Cir. 1974); sec. 1.404(a)-1(b), Income Tax Regs.
Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered". The pertinent parts of section 1.162-7(a) and (b)(1), Income Tax Regs., provide: The test of deductibility in the case *633 of compensation payments is whether they are reasonable and are in fact payments purely for services. * * * Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. * * * See Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958). Thus, a taxpayer must show that the amount paid as compensation (1) is "reasonable" and (2) is for services actually rendered. An employer is not permitted to deduct compensation paid to an employee, without proof that the employer actually received the benefit of personal services from the employee. E.g., American Lithofold Corporation v. Commissioner, 55 T.C. 904, 917 (1971); Quinn, et al. v. United States, 40 AFTR 5097, 77-1 USTC par. 9369 (D. Md. 1976). Close scrutiny is given to deductions claimed for payments made by a corporation controlled by those to whom the payments are made. Tulia Feedlot, Inc. v. U.S., 513 F.2d 800, 805 (5th Cir. 1975); Darco Realty Corp. v. Commissioner, 301 F.2d 190, 191 (2d Cir. 1962), *634 affg. T.C. Memo. 1961-110. Petitioner argues that all of the compensation paid to Mr. Barr during fiscal year 1984 is deductible under section 162. Petitioner asserts that "the undisputed evidence in this case establishes that all of Petitioner's income was derived from the rendition of legal services by Petitioner". Petitioner further asserts "that such income was produced solely and only through the efforts of Mr. Barr." Based on those assertions, petitioner argues that it meets both the "reasonable amount" test and the "for services actually rendered" test of section 162(a)(1). We disagree. Aside from Mr. Barr's testimony, discussed further below, the record of this case includes only two items of evidence to show the source of petitioner's income during fiscal year ending February 29, 1984. The first consists of an affidavit by a representative of Western Publishing Company, Inc. which states that during calendar years 1983 and 1984, the company paid petitioner $ 3,556.80. The affidavit does not describe the nature of those payments, and there is no evidence that they were for Mr. Barr's legal services. The second is a check dated March 18, *635 1983, in the amount of $ 25,000 drawn by Enersonics to petitioner. There is no evidence to show the nature of that payment or to show that the payment was for Mr. Barr's legal services. We note that the record also contains an invoice dated January 27, 1984, which was issued by petitioner to United Subscription Services in the aggregate amount of $ 1,317.14. However, the record does not show that such amount was paid by United Subscription Services or that it was received by petitioner before the end of the subject fiscal year. During discovery, respondent asked petitioner to "identify by name, current address and telephone number the clients or customers of Sheldon P. Barr, P.C. during the taxable year ended February 28, 1984." Petitioner objected to that interrogatory as "overly broad, overly burdensome, irrelevant, and not calculated to lead to admissible evidence." Petitioner never answered that interrogatory. During discovery, respondent also asked petitioner to produce: All books and records of Sheldon P. Barr, P.C., including, but not limited to, general ledgers, cash receipts and disbursements journals, bank statements, cancelled checks and any and all other records *636 of the receipt and payment of sums by Sheldon P. Barr, P.C. for the taxable year ended February 28, 1984. The Court granted respondent's Motion to Compel a response to the above production request and other discovery and petitioner responded to it as follows: Responding to respondent's request #1, objects to such request as being overly broad, unduly burdensome, irrelevant and not calculated to lead to the discovery of evidence in this action. Without waiving such objection, it will produce the Sheldon P. Barr, P.C. cash disbursements journal, cancelled checks, other records of payments of sums for the taxable year ended February 28, 1984. No general ledger exists for said period of time. Petitioner produced no receipts journal or other record of the source of petitioner's gross income. Respondent also issued a subpoena to Mr. Barr to produce the following records at trial: The original or legible copies of books and records of Sheldon P. Barr, P.C. for the taxable year ended February 29, 1984, including, but not limited to, general ledgers, cash receipts and disbursements journals, bank statements and cancelled checks. Mr. Barr did not produce any records of petitioner's *637 cash receipts in response to respondent's subpoena. Respondent's attorneys sought the above discovery to prove the Commissioner's position that Mr. Barr caused the proceeds from the energy brain scheme to be distributed to petitioner and that such amounts constituted the earnings and profits of Enersonics. According to respondent, The attempted characterization of the payment to Barr as "compensation" was merely a laundering of Enersonics' corporate distributions and a ruse to justify the establishment and amount of the contributions to the pension plans. At the start of trial, the Court determined that petitioner had been uncooperative and evasive during discovery. It granted respondent's motion for sanctions and ordered that petitioner was prohibited from introducing into evidence any document or testimony which respondent had requested during discovery. Petitioner did not object to the Court's order. In order to meet its burden of proving that the compensation paid to Mr. Barr during fiscal year ending February 29, 1984, is deductible under section 162, petitioner relies entirely upon the testimony of Mr. Barr, who testified as follows: That return [for the year ending *638 February 28, 1984] shows that petitioner for such period of time had a gross income of $ 348,000. All of that income was derived from the rendition of legal services by the petitioner. * * * In addition to the legal services income, the petitioner had $ 95 in interest income. * * * In addition, Sheldon P. Barr produced all of the income and the income of the corporation was solely and only produced through his efforts and through nobody else's efforts. * * * Sheldon P. Barr was the sole officer, director and employee of Sheldon P. Barr, P.C., ran all its affairs and was solely and exclusively responsible for the gross income and profits of petitioner, and on that basis, I submit salary of $ 200,000 was reasonable. * * * I believe I previously stated that petitioner was a professional service corporation and all of its income was generated through the rendition of legal services. Mr. Barr's testimony concerning the source of petitioner's gross receipts and the services which he allegedly performed for petitioner is general and is not substantiated by documentary evidence of any kind. The record contains no list of petitioner's clients, no time sheets, no billing records, *639 and no other documents to identify the source of the income reported by petitioner and the nature of petitioner's business. Petitioner was asked to produce such information during the pretrial phase of this case and failed to produce it. A party's failure to introduce evidence within his possession gives rise to the presumption that the evidence would be unfavorable if produced. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Moreover, there is no evidence to establish the nature, scope, and extent of any personal services performed by Mr. Barr for petitioner in return for the subject compensation, other than his general testimony set forth above. Mr. Barr's testimony does not explain how he was able to provide services worth $ 329,604 to petitioner, while, at the same time, he was managing the energy brain shelter, practicing law in his individual capacity as a partner in Barr & Bello, and engaging in the law practice reflected by the Schedule C filed with Mr. Barr's individual return. We are not required to accept a taxpayer's testimony, even if there *640 is no contrary evidence in the record. Lakewood Manufacturing Co. v. Commissioner, 453 F.2d 451, 454 (6th Cir. 1972), affg. T.C. Memo. 1970-133. We do not accept Mr. Barr's unsubstantiated testimony that all of petitioner's income was derived from the rendition of legal services and that such income was produced solely through the efforts of Mr. Barr. For the above reasons, we find that petitioner has failed to prove that the compensation paid to Mr. Barr was for personal services actually rendered to petitioner during fiscal year ending February 29, 1984. Accordingly, we hold that petitioner has failed to prove that the compensation paid to Mr. Barr in the aggregate amount of $ 329,604 is deductible under section 162(a)(1). 4. Pension Plan Issue
The above holding that petitioner is not entitled to deduct, under section 162, the compensation paid to Mr. Barr during fiscal year ending February 29, 1984, consisting of $ 200,000 in salary and $ 129,604 in contributions on Mr. Barr's behalf to two pension trusts, makes it unnecessary for us to address respondent's determination that the pension plan contributions are *641 not deductible under section 404. 5. Petitioner's Other Business Deductions
Petitioner bears the burden of proving that the other expenses claimed on its return for fiscal year ending February 29, 1984, are deductible under section 162(a). Rule 142(a). At trial, Mr. Barr referred to copies of petitioner's checks for the subject expenditures and a listing of those checks in a document referred to in the stipulation as "two pages purporting to be a disbursement journal", and he testified as follows: Those documents show the following expenses which were incurred in the ordinary course of business and were ordinary and necessary business expenses in the dominant purpose of those expenses were for business purposes for petitioner. Respondent's cross-examination of Mr. Barr developed the fact that $ 6,714.04 of the "travel and entertainment" expense deducted on petitioner's return was paid in connection with a reception following the bar mitzvah of Mr. Barr's son. Respondent's cross-examination also developed the fact that the telephone expense deducted on the return in the amount of $ 1,196 was for a telephone at Mr. Barr's residence and that $ 1,053 of the cleaning and *642 repairs expense deducted on the return was for gardening at Mr. Barr's residence. In its post-trial briefs, petitioner argues that the expenses for the bar mitzvah reception are deductible on the ground that "it is a common practice for law firms to hold parties and gatherings of various nature, in order to expose their lawyers to clients and potential clients." However, petitioner did not introduce a list of the persons who attended the reception or otherwise prove that the reception included clients and potential clients. Moreover, petitioner failed to substantiate the expenses as required by section 274(d). See Feldman v. Commissioner, 86 T.C. 458 (1986). Petitioner also argues that the expense of a telephone at Mr. Barr's residence and the cost of gardening at Mr. Barr's residence are deductible. However, petitioner failed to prove that petitioner maintained an office at Mr. Barr's residence. Significantly, Mr. Barr's private secretary, Ms. Phyllis Martin, who had worked with him since 1977, was unaware that Mr. Barr worked at home or that petitioner maintained an office in Mr. Barr's residence. There is no evidence that petitioner met with *643 clients at Mr. Barr's residence. Petitioner's certificate of incorporation states that its address is the Seventh Avenue address of the Barr & Bello law firm, 370 Seventh Avenue, Suite 1800, New York, New York; petitioner's stationery and business checks bear the Seventh Avenue address; petitioner's bank statements were sent to the Seventh Avenue address; and petitioner's bills were sent to the Seventh Avenue address. Accordingly, we find that petitioner failed to prove that it maintained an office in Mr. Barr's residence, and we sustain respondent's determination that the telephone and gardening expenses are not deductible. Petitioner argues that the other expenses disallowed by respondent are deductible. Petitioner appears to contend that Mr. Barr's testimony made a prima facie case that the expenses are deductible, and shifted to respondent the burden of going forward with the evidence as to each of those items. We disagree. Mr. Barr's testimony was a general statement that all of the expenses deducted on petitioner's return were ordinary and necessary business expenses. He provided no details about petitioner's business and the relationship of each of the expenditures to *644 that business. As mentioned above, we are not required to accept the testimony of an interested party, and we do not accept Mr. Barr's testimony in this case. Tokarsi v. Commissioner, 87 T.C. 74, 77 (1986). Accordingly, we sustain respondent's determination that the other expenses claimed on petitioner's return are not deductible under section 162(a). 6. Net Operating Loss Carryforward
One of the deductions claimed on petitioner's return for fiscal year ending February 29, 1984, is a net operating loss deduction in the amount of $ 3,367. The return includes a schedule which states as follows: N.O.L. C/F from 2/28/82
8,291
Used 2/28/84
3,367
Available C/F from 2/28/28 (sic)
4,924
Respondent disallowed the above net operating loss deduction. The notice of deficiency states as follows: It is determined that your net operating loss carry forward from February 28, 1982 to February 28, 1984 in the amount of $ 3,367.00 is disallowed for lack of substantiation. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a). Mr. Barr's testimony concerning this issue is as follows: THE WITNESS: *645 I make reference now, Your Honor, to Exhibit 4-D which is the petitioner's tax return for the year ended 2/28/83. THE COURT: This is the year before Judge Cohen. THE WITNESS: Yes. THE COURT: All right. THE WITNESS: I state or testify that except as modified by Judge Cohen's decision this -- and as found by Judge Cohen, this return is true and correct and shows a balance of a net operating loss carryforward of $ 8,291. I don't know where respondent gets the $ 3,367 from but this shows that there was an available credit of $ 43,497 of which 34,802 was used leaving an available credit of $ 8,291. Am I wrong? THE COURT: Last page of Exhibit 4-D suggests that there are carryforwards from two years -- fiscal year '81 in the amount of $ 8,692 and fiscal year '82 in the amount of $ 34,802. The total of those, $ 43,494, was available for the year reflected in that Exhibit 4-D which was the year ending February of '83 and for that year there was used $ 35,203 which left an available carryforward of $ 8,291. That's what the last page of that exhibit purports to say to me. THE WITNESS: Yes, I'm sorry, Your Honor. Your Honor read it correctly. It's my testimony that this return as *646 read by Your Honor is true and correct. It is evident from the above that Mr. Barr seeks to substantiate the deduction of a net operating loss carryover from fiscal year ending February 28, 1982, by reference to petitioner's return for fiscal year ending February 28, 1983. Significantly, the record does not include a copy of petitioner's return for fiscal year ending February 28, 1982. At trial, Mr. Barr acknowledged that he had the return, but it was never produced to respondent or introduced as evidence. In this situation, we infer that it would not have been favorable to petitioner if it had been introduced. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Furthermore, Mr. Barr's testimony that the return for fiscal year 1983 is "true and correct" is not sufficient to establish petitioner's eligibility for a net operating loss carryforward from fiscal year ending 1982. A tax return is merely a statement of a taxpayer's claim and does not establish the correctness of the facts stated therein. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); *647 Roberts v. Commissioner, 62 T.C. 834, 837 (1974); Seaboard Commercial Corp. v. Commissioner, 28 T.C. 1034, 1051 (1957). Because the record is devoid of any other evidence to substantiate the net operating loss carryforward, we sustain respondent's determination on this point. 7. New Jobs Credit
Petitioner's return for fiscal year ending February 29, 1984, includes a schedule which states as follows: Job Credit C/F from 2/28/79 1,416
The credit was not used on the subject return, but it purports to be available as a carryover from petitioner's return for fiscal year ending February 28, 1979. That return reports salaries and wages in the amount of $ 16,221, in addition to the compensation paid to officers. The 1979 return also includes petitioner's computation of a tentative jobs credit in the amount of $ 4,189. Of that amount, $ 2,522 was used on the 1979 return. Respondent determined that petitioner was not entitled to the jobs credit for fiscal year ending February 29, 1984. The notice of deficiency states as follows: We have disallowed your Jobs Credit carryforward because you have not substantiated *648 that you are entitled to that deduction. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a). At the outset, we note that the credit claimed on petitioner's 1979 return is the "new jobs credit" under former Code sections 44B, 51, 52, and 53, which were added to the Code by the Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, 92 Stat. 126. The new jobs credit later became the targeted jobs credit in the case of amounts paid after December 31, 1978, in taxable years ending after such date. However, a transitional rule permitted the new jobs credit to continue to apply in the case of a taxable year beginning in 1978 and ending after December 31 of that year. Pub. L. 95-600, sec. 321(d)(3), 92 Stat. 2831. The only evidence in the record to substantiate petitioner's eligibility for the credit consists of petitioner's fiscal year 1979 return, described above, and testimony by Mr. Barr. He testified as follows: To be more specific, I refer the Court to Form 5884, the fifth page on that return [fiscal year 1979] shows the method in which the new jobs credit was calculated and taken pursuant to the terms of the Internal Revenue *649 Code existing at the time such return was filed for the year ended 2/28/79 and I testified that the information supplied in that form was true and correct and that petitioner at such time was entitled to a $ 2,522 job credit. The above testimony is nothing more than a bald assertion that the credit was properly computed on petitioner's fiscal year 1979 return. Mr. Barr offered no facts to support that conclusion, and we find that Mr. Barr's testimony is not sufficient to substantiate the credit. Furthermore, at trial, Mr. Barr acknowledged that the difference between the credit computed on petitioner's 1979 return, $ 4,189, and the credit taken on that return, $ 2,522, is $ 1,667, or $ 251 more than the amount claimed on petitioner's return for fiscal year ending February 29, 1984. During his testimony, Mr. Barr acknowledged this discrepancy but he was not able to resolve it. The record of this case does not contain petitioner's returns for fiscal years ending February 28, 1980, and February 28, 1982. Therefore, strictly speaking, neither Mr. Barr's testimony nor the record of this case establishes that $ 1,416 of the credit computed for fiscal year ending February 28, 1979, *650 remained unused and was available as a carryover for the year at issue. In its post-trial briefs, petitioner appears to argue that respondent cannot disallow a carryforward of unused credit from fiscal year 1979 because "the statute of limitations has expired". We have previously rejected similar arguments. See Mennuto v. Commissioner, 56 T.C. 910, 923 (1971). The issue in this case is whether petitioner is entitled to claim a jobs credit for fiscal year ending 1984. The period of limitations on assessments under section 6501 has not expired with respect to petitioner's fiscal year ending February 29, 1984, and petitioner has failed to prove that it is eligible to take the credit for that year. Accordingly, we sustain respondent's determination on this point. 8. Unreported Interest Income
In respondent's Amendment to Answer, the Commissioner asserts that petitioner failed to report $ 12,383 which it earned during fiscal year ending February 29, 1984, as interest on a "special account" maintained with Manufacturers Hanover Trust. The parties agree that this issue is a new matter and that respondent bears the burden of proof. Rule 142(a). *651 The record in this case establishes that petitioner maintained the subject account with Manufacturers Hanover Trust. The monthly bank statements for the account, which are stipulated exhibits, name petitioner as the account holder, and report that interest in the amount of $ 5,924.61 was credited to the account during petitioner's fiscal year ending February 29, 1984, and that additional interest of $ 6,458.39 was paid into the account on February 6, 1984. Petitioner concedes that it owned the subject account at Manufacturers Hanover Trust. It also concedes that interest was credited to the account during fiscal year 1984 in the amount of $ 12,383 (i.e., $ 5,924.61 plus $ 6,458.39). Based on the above facts, we find that respondent has established that petitioner failed to report the interest of $ 12,383 earned on funds in the subject account at Manufacturers Hanover Trust during the year in issue. See Davis v. Commissioner, 81 T.C. 806, 819 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). Respondent's proof is prima facie evidence of a deficiency and imposes on petitioner the burden of going forward *652 with the evidence to show that there was in fact no deficiency in its income tax. Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967); United States v. Campbell, 351 F.2d 336, 338-339 (2d Cir. 1965). The cases cited by petitioner, Armes v. Commissioner, 448 F.2d 972 (5th Cir. 1971), affg. in part and revg. and remanding in part T.C. Memo. 1969-181, and McSpadden v. Commissioner, 50 T.C. 478 (1968), are cases in which respondent proved only that the taxpayer received payments in circumstances in which the payments were not necessarily income. In this case, on the other hand, respondent has shown that the payments are interest on funds which petitioner maintained in its name. In these circumstances, respondent has made a prima facie case that petitioner failed to report the subject interest as income. Petitioner makes the factual contention that the funds deposited in the amount are "escrow funds and not those of Petitioner" and, therefore, "the interest earned was not earned by Petitioner but by such other persons". However, *653 there is no evidence in the record to prove that contention. The only evidence cited by petitioner is the testimony of a representative of Manufacturers Hanover Trust who stated that accounts designated "special accounts" are often opened by attorneys, accountants, and other consultants to hold escrow funds. Mr. Booker did not testify about the nature of petitioner's account, and he agreed that "the designation special account doesn't always mean it's an escrow account". Petitioner cites no other evidence to support its contention, and our examination of the record does not reveal any. 9. Additions to Tax for Negligence
Respondent's Amendment to Answer asks for the following relief among others: That the Court determine that the petitioner is liable for the addition to tax provided under I.R.C. § 6653(a)(1) in the amount of $ 8,291.00, and I.R.C. § 6653(a)(2) in an amount equal to 50% of the interest payable under I.R.C. § 6601, pursuant to the provisions of I.R.C. § 6214(a). The parties agree that respondent bears the burden of proving that petitioner is liable for these additions to tax. Rule 142(a). Respondent claims that the entire underpayment, $ 165,820, consisting *654 of the amount determined in the notice of deficiency, $ 160,124, plus the amount asserted in respondent's Amendment to Answer, $ 5,696, is subject to the addition under section 6653(a)(1). As asserted in respondent's Amendment to Answer, the amount of this addition, $ 8,291, is 5 percent of the entire underpayment, $ 165,820. In order to prevail as to this issue, respondent must show that "any part" of the underpayment was due to negligence or intentional disregard of rules or regulations. Sec. 6653(a)(1). Respondent also claims that the entire underpayment is subject to the addition to tax under section 6653(a)(2). In order to prevail as to this issue, respondent must show that each portion of the underpayment was due to negligence or intentional disregard of rules or regulations. Sec. 6653(a)(2). For purposes of section 6653(a), negligence is the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967). Respondent argues that petitioner's *655 failure to report the interest income from its "special account" clearly constitutes a failure to do what a reasonable and prudent person would do under the circumstances. Respondent asserts that petitioner's president, an experienced tax attorney, was "certainly aware of the requirement under I.R.C. § 61(a)(4) and Treas. Reg. § 1.61-7(a) that interest income is taxable and must be reported on an income tax return." Respondent also claims to have presented a "prima facie" case that the entire underpayment was due to negligence and argues that petitioner failed to present evidence to overcome respondent's proof. We disagree. We find that respondent has failed to show that any part of the underpayment was due to negligence. The subject return discloses that it was prepared on petitioner's behalf by Mr. Ballin of Bernstein & Ballin, P.C. of Valley Stream, New York. Nevertheless, respondent's proof contains nothing to show what part Mr. Ballin, the return preparer, played in preparing the return. We agree that petitioner's president and sole shareholder, Mr. Barr, is an attorney who has displayed some understanding of the tax law. That fact alone, however, does not establish *656 that Mr. Barr was responsible for the preparation of the subject return. There is nothing in this case to suggest that petitioner did not reasonably rely on the return preparer. A taxpayer who makes full disclosure to an accountant or other qualified expert and relies on the expert's advice in good faith, is not negligent. Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). Accordingly, we find that respondent has not proven that any part of the understatement was due to petitioner's negligence. 10. Addition for Understatement of Income
In the notice of deficiency, respondent determined that there was a substantial understatement of income tax for petitioner's fiscal year ending February 29, 1984, within the meaning of section 6661. Respondent also determined that the underpayment for the year, $ 160,124, was attributable to the substantial understatement. Accordingly, respondent added to petitioner's tax for the year, 25 percent of the underpayment, $ 40,031 (i.e., $ 160,124 x 25%). Petitioner bears the burden of proving that respondent's determination is erroneous. Rule 142(a). In respondent's Amendment to Answer, the Commissioner *657 also claims that the additional deficiency asserted therein, in the amount of $ 5,696, attributable to the unreported interest income from petitioner's account at Manufacturers Hanover Trust, is also subject to section 6661. In effect, respondent asks the Court to treat the additional deficiency asserted in respondent's Amendment to Answer as an additional underpayment attributable to the substantial understatement of income tax determined in the notice of deficiency. Thus, respondent asks the Court to increase the addition under section 6661 by $ 1,424 (i.e., $ 5,696 x 25%). Respondent bears the burden of proof on this new issue. Rule 142(a). Section 6661(a) imposes an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax which is assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498 (1988). In the case of a corporation, other than an S corporation or a personal holding company, an understatement of income tax is a "substantial understatement" if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 10,000. Sec. 6661(b)(1). *658 Generally, the amount of the "understatement" for purposes of section 6661(a) equals the excess of the amount of tax required to be shown on the return over the amount of tax reported on the return. Sec. 6661(b)(2)(A). However, section 6661(b)(2)(B) provides that the amount of the understatement shall be reduced by that portion of the understatement which is attributable to (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. In this case, the deficiency is attributable to the following five items: (1) Income tax bracket amounts, (2) the deduction of Mr. Barr's salary and pension plan contributions, (3) the other deductions taken on the return, (4) the net operating loss carryover from fiscal year ending February 28, 1982, and (5) the unreported interested income. We sustained respondent's determination with respect to each of those items and, for purposes of determining the amount of the "understatement", as defined by section 6661(b)(2)(A), the amount *659 of the tax required to be shown on the return for petitioner's fiscal year ending February 29, 1984, will include the tax imposed with regard to all of the above items, other than the net operating loss carryover from fiscal year 1982, discussed below. In the case of the unreported interest income from Manufacturers Hanover Trust, respondent has thus made a prima facie case for inclusion of this item as part of the understatement under section 6661(b)(2)(A). As to this item, we hold that the burden of going forward with the evidence shifted to petitioner to show some reason why it should not be included for purposes of section 6661. The regulations under section 6661 require that, for purposes of computing whether there was an understatement, the tax shown on the return is computed as if certain items had received the proper tax treatment. Sec. 1.6661-2(d)(2), Income Tax Regs. This is true in the case of items for which there was substantial authority for the treatment claimed on the return and for items with respect to which there is adequate disclosure. Sec. 1.6661-2(d) (2)(i) and (ii), Income Tax Regs. In passing, we note that this is also true for the following: Items *660 taken into account in computing the amount of any net operating loss, unused tax credit, or net capital loss for a taxable year the return for which was due (determined without regard to extensions of time for filing) before January 1, 1983 (regardless of whether there is substantial authority or adequate disclosure with respect to such items). [Sec. 1.6661-2(d)(2)(iv), Income Tax Regs.] Section 1.6661-2(d)(6)(i), Income Tax Regs. states as follows: (6) Treatment of Carryovers -- (i) In General. A net operating loss carryover, tax credit carryover, or capital loss carryover shall be treated for purposes of section 6661 as a credit or deduction in the year in which the carryover is taken into account. See paragraph (d)(2)(iv) of this section for rules applicable to carryovers from a taxable year the return for which was due (without regard to extensions of time for filing) before January 1, 1983. In this case, respondent disallowed a net operating loss carryover from fiscal year ending February 28, 1982, in the amount of $ 3,367. The due date for that return was before January 1, 1983. Thus, based upon the regulations quoted above, the tax on the net operating loss *661 carryover from fiscal year 1982 should not be included in the amount of the "understatement" for purposes of section 6661. Petitioner argues that there was no "understatement" within the meaning of section 6661(b)(2) because there was substantial authority for petitioner's treatment of the items on its return and there was adequate disclosure "as to reasonableness of Mr. Barr's salary and pension deduction". Petitioner's entire argument concerning section 6661, as set forth in its opening brief, is as follows: IRC Sec. 6661(a)
Respondent in its Notice of Deficiency sought to assess "Substantial Understatement" Section 6661(a) penalty on the deficiency alleged therein. By an amended answer Respondent sought to increase such penalty by $ 1,424 on additional items of alleged deficiency in the amended answer.* It is submitted firstly that no such penalty is due because the alleged deficiency is not due. Assuming arguendo that any such deficiency does exist it is clear from the record that the tax treatment of such items were in accord with substantial authority and that all relevant *662 facts affecting the item or items were adequately disclosed in the return. *
*663 As seen from the above petitioner argues that it adequately disclosed the relevant facts affecting the tax treatment of items on its return. However, petitioner's argument consists only of a statement to that effect. Petitioner makes no specific reference to any fact which it claims constitutes adequate disclosure and based upon our view of the subject return, we see none. Similarly, petitioner argues that there was substantial authority for the tax treatment of the items on its return. However, petitioner's argument consists only of a general statement to that effect. Petitioner refers to our opinion in Barr I, but that opinion was rendered after the date on which petitioner's return for fiscal year ending February 29, 1984, was filed and, thus, it does not constitute authority for petitioner's treatment of any item on that return. Sec. 1.661-3(b)(4)(iii), Income Tax Regs. We are not aware of any authority for the tax treatment of any of the items taken on petitioner's return. Accordingly, we sustain respondent's determination of the addition to tax under section 6661. To reflect the foregoing and concessions by the parties, Decision will be entered under Rule 155 *664 . Footnotes
*. The said penalty for the return in question was 10% not 25% as sought in the Notice of Deficiency. Petitioner's entire argument concerning section 6661, as set forth in its reply brief, is as follows: Petitioner submitted that there is no understatement of tax because there is no tax due by Petitioner. However if this Court should determine a deficiency, as can be seen by Petitioner's opening brief and this brief, supra clearly such item had substantial [sic] authority for Petitioner's treatment on its return. For example, this Court in Barr I found under the same facts and law as this case that Petitioner's pension plan deduction was proper. As pointed out above Petitioner's tax return (Ex 3-C) was prepared by certified public accountants, who signed the return as its preparers. Further, Petitioner's tax return contained adequate disclosure as to reasonableness of Mr. Barr's salary and pension deduction under IRC Sec. 6661(b)(2)(B) and Rev. Proc. 85-26↩.
*. As to the additional penalty respondent bears the burden of proof. Tax Court rule 142↩.